Bruce H. Nagel
Diane E. Sammons
**NAGEL RICE, LLP**
103 Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
bnagel@nagelrice.com
dsammons@nagelrice.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEDA YARNALL, CHERYL AND MARK HIBBARD, MADELENE AND CHRISTOPHER FUNK, TATIANA MYKYTA POLANIN, HECTOR CHAVERRA, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>FIFTH THIRD BANK, N.A., surviving company of DIVIDEND FINANCE, LLC, a California corporation, and UNIDENTIFIED ENTITIES A through Z, Inclusive,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

The plaintiffs, on behalf themselves and all others similarly situated, by their attorneys Nagel Rice, LLP, make the following allegations on personal knowledge and information and belief:

**I.  IDENTIFICATION OF PARTIES
<u>(Local Rule 10.1)</u>**

1.  The names and address of the named parties to this action are plaintiffs: (i) Neda Yarnall ("Ms. Yarnall"), Scotch Plains, N.J. 07078; (ii) Cheryl and Mark Hibbard, (the

1

"Hibbards"), Bricktown, N.J. 08734; (iii) Madelene and Christoper Funk (the "Funks"), Wolcott, CT 06716; (iv) Tatiana Mykyta Polanin ("Ms. Polanin") Northvale, N.J. 07647; and (v) Hector Chaverra (Mr. Chaverrra"), Toms River, N.J. 08753. The named defendant is Fifth Third Bank, located at 38 Fountain Square Plaza, MD 10907F in Cincinnati, OH 45263

## II.   THE NATURE OF THE ACTION

2.      This is a class action lawsuit brought for actual damages, equitable relief, including restitution, injunctive relief, and disgorgement of profits and all other relief on behalf of themselves and all other similarly situated individuals (the "Class" or "Class Members") who were entered into loan agreements with Dividend Finance LLC ("Dividend") that subsequently merged into Fifth Third Bank, NA ("Defendant" or "Fifth Third Bank"), for the purchase, installation and operation of residential solar equipment on their homes.

3.      The matter arises from the deceptive business and lending practices implemented by Dividend, its agents, employees, partners, representative and affiliated entities through which its employees utilize confusing and misleading sales tactics including, but not limited to: 1) surreptitiously entering unwitting consumers into its loan agreements by misrepresenting that consumers are merely securing pre-approval status; 2) misrepresenting to consumers the financial benefits of solar power including the amount of power to be generated, the availability of tax credits to offset loan payments, and the length of time required for permits, inspections and certificates for the solar system to become operational which directly impacts whether a customer can take advantage of a Dividend incentive payment that reduces the monthly loan payment and; c)  failing to disclose material facts such as finance fees associated with the loan.

4.      The marketing, sales techniques, methods of entering consumers into loan agreements and the terms and conditions of the loans themselves are uniform.

5.     Dividend's sales and profit model is to eschew direct marketing, in favor of procuring relationships with sellers of solar power equipment ("solar power partners") across the country and to utilize these business partnerships to market their loans in connection with the sales of the solar panel systems. Dividend and their solar power partners quote to consumers very low interest rates and monthly installments while promising installments will be offset by energy savings. The emphasis on low finance costs induces consumers to both purchase the solar systems and finance them through Dividend (rather than finance through their own banks, credit unions or other lenders.)

6.     The sales model is highly profitable but misleading. While the interest rates and incentives appear attractive, they conceal a large upfront fee charged by Dividend that is added to the price of the system and each loan that consumers must repay. Dividend's upfront fee is hidden from consumers in sales proposals that describe the system and financing, and it is not included in disclosures of finance costs that Dividend makes when originating the loan.  Upon information and belief, Dividend affirmatively misrepresents to consumers that the entire price and balance of the loan pays for the costs of the system's parts and installation.  Dividend also directs its solar partners to downplay the financed price in favor of emphasizing low monthly installment payments (to be purportedly offset by electricity savings.)

7.     Dividend allowed, encouraged, and/or directed its sales partner to engage in sharp and misleading sales tactics, including misrepresentations about the capacity of the panels, the timing and process for installation and certification, the availability of state and federal tax credits to offset the costs of financing.  At all times Dividend knew or should have known that these sales representations were false.

3

8.      As a consequence of Dividend's failed and misleading statements and active and ongoing concealment of the true cost of financing, Plaintiffs and the Class Members purchased, and financed solar panel systems that are valueless or of limited value.

9.      On July 31, 2024, Dividend was merged into the Defendant who became the successor surviving company.

10.      Plaintiffs assert claims on behalf of themselves and the Class Members under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2, *et seq*. (the "CFA") and similar state laws. Plaintiffs also assert claims on behalf of themselves and the Class for fraudulent concealment/nondisclosure, unjust enrichment, and negligent misrepresentation under New Jersey law.

11.      Plaintiffs seek actual damages, injunctive relief, restitution and/or disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to the Class.

### III.      <u>PARTIES</u>

12.      Plaintiff Ms. Yarnall is a citizen of Scotch Plains, New Jersey, On or about May 30, 2023, Yarnall was surreptitiously entered into a loan agreement without her permission after Dividend's sales partner representative, represented he was only seeking pre-approval status for the loan ($42,428) and that Ms. Yarnall could pay cash ($25,000) for the system upon its installation, thus eliminating the need for financing.

13.      Ms. Yarnall's direct communications with Dividend confirmed this understanding. Additionally, Dividend and its solar power partner confirmed that, if Ms. Yarnall decided to secure a loan, she would receive a tax credit, that could be paid towards the loan, thus maintaining a low monthly loan payment amount. Thereafter, Ms. Yarnall received an email informing her that the installation was complete when it was not.  Ms. Yarnall communicated that fact to Dividend who

advised that they had already released funds and that and that "financing is complete."  When she complained that it was not complete, the Dividend representative advised that "you still owe the loan" and hung up the phone. Thereafter, Ms. Yarnall received communications that Dividend had accepted loan payments from the solar power partner, Vision Solar, on behalf of Yarnall when Yarnall never authorized receipt of same.  Meanwhile, the incomplete installation was defective causing her roof to leak; the plans submitted to the town were incorrect; and Ms. Yarnall learned that necessary permits from the municipality had not been granted prior to the start of installation, nor prior to the release of funds by Dividend.

14.     Ms. Yarnall's system was not consistent with the products she was promised, and the system is inoperable, and Dividend, through its successor Defendant continues to demand payment.

15.     Dividend made the first milestone payments to its solar power partner upon the mere submission of a photo and a general plan of installation without confirming the address of location; that the products installed were consistent with the products promised or that the plans would pass municipal approval.

16.     Alternatively, Yarnall consented to the Loan Agreement that was part and parcel of the purchase of a solar system that was essentially worthless because of misrepresentations as to installation of the system and its operability which left Ms. Yarnall with non-functioning solar equipment affixed to her roof.

17.     Plaintiffs Hibbard are citizens of Bricktown, New Jersey.  In or about February 2023, Plaintiffs Hibbard were surreptitiously entered into a loan agreement, after Dividend's partner, solar company representative told them that certain screens Mr. Hibbard initialed on the sales representative's tablet were for pre-approval for credit only.  The salesperson discussed an

amount of $18,000 and that the costs of a proposed loan would be paid for from the electricity savings and from tax credits. However, when electronic screens were shown to Mr. Hibbard on the sales representative's tablet that Mr. Hibbard initialed, nowhere did a dollar amount appear. Quickly thereafter, workers showed up to install the panels but there was no further loan information. When the Plaintiffs Hibbard checked their credit score, they discovered a loan for $62,000. Immediately upon learning this, they called the sales representative for the solar company and then Dividend to cancel the loan, but Dividend failed to do so.

18.     The installation that was done failed inspection twice and it did not begin to produce electricity until some eight (8) months later. The panels never produced the amount of electricity that was promised by the sales representative or to even achieve some savings, it required the removal of two trees which the representative had previously promised would not be necessary to achieve the electrical output that had been promised.

19.     When the Hibbards attempted to sell their home, the purchasers backed out of the deal because of the refusal by purchasers to take over the purported loan.

20.     Alternatively, the Plaintiffs Hibbard entered into a loan agreement that was of limited value, where Dividend's sales partner misrepresented the functionality of the solar system; the amount of electricity it could generate and the availably of tax credits, and where Dividend secretly hid up front finance fees.

21.      Plaintiffs Christopher and Madelene Funk are citizens of Wolcott, Connecticut. In or about January 2023, the Funks were surreptitiously entered into a loan agreement when they were told that the information being entered into the Sales representative's tablet was for pre-approval of credit only. Initially, Mr. Funk received a phone solicitation from an individual who represented himself as coming from Eversource (the Connecticut utility company) and who was

interested in setting an at home appointment to discuss solar power.  Mr. Funk advised that they had decided against solar power because they were informed their lot was too wooded to make it cost effective. The representative insisted it would work and that Eversource was required to do 20% of solar power a year and his house had been picked.  Mr. Funk agreed to meet with the representative.   A representative did appear on the designated date and time but indicated that he was not from Eversource but was contracted by Eversource.  It was later revealed from a call to Eversource that this was a misrepresentation.

22.     The salesperson, who was from Dividend's solar power partner, Vision Solar, stayed for approximately 5 hours.  He did an inspection around the exterior and interior of the house, asked to see utility bills for a year and then got out his tablet and did a calculation as to the amount of kilowatts that the advertised system would generate with the aim of getting to 110% of power generated from solar.  Next, he entered information to get a credit score and said he was seeking to pre-qualify Mr. Funk for a loan.

23.     Mr. Funk specifically expressed that he was not interested in financing in that he could secure same through his credit union.  Despite this, the salesperson, noted that Mr. Funk could not get a 2.99 APR elsewhere and that the inputting of Mr. Funk's financial information was only for pre-credit approval.  The salesperson further advised that the loan would cost $234.00 per month for the life of the loan provided that Mr. Funk would pay the solar rebate he received back to   the lender. The salesperson indicated the rebate would be $7,500.

24.     The salesperson pulled up a type of agreement on his tablet and wanted Mr. Funk to initial at the bottom of several screens. Mr Funk advised that he could not comprehend the language on the screens, nor could he enter his signature because he was disabled with dyslexia. Regardless, the representative entered the data and his initials claiming it was for pre-approval for

credit only.  Thereafter, the Funks were not provided with any written copy of the document(s) that he viewed. It was not until months later, in late April, early May, after the panels were placed on his roof, when he contacted Dividend that he was advised that he had entered into a loan.  He immediately tried to cancel but was refused.

25.    Alternatively, the Funks entered into a loan agreement that was essentially worthless because of misrepresentations as to installation of the system and its operability which left the Funks with non-functioning solar equipment affixed to their roof.

26.    The installation of the solar system was flawed from the start, precluding the system from becoming operational.  Despite this, Dividend Finance paid the installer.  These defects included installing the electrical box in the wrong place and not having a electrician present during the installation, When Mr. Funk reported this, it was revealed that it appeared that an assessment of his house for solar power had actually been performed on the wrong house, further complicating whether the promises made about electrical output were based upon calculations made on his home. Mr. Funk made calls to both Vision Solar and Dividend, demanding a re-assessment and resolution.  While Dividend agreed to "fix" the issues around the solar system installation, in truth, the contractor who was to assist, indicated he was not hired to do a re-assessment and negotiations broke down, but Dividend still demands payment.

27.    Thus, the Plaintiff Funks are left with an inoperable solar system despite scores of efforts at resolution over the past eighteen (18) months.

28.    Plaintiff Tatiana (Mykyta) Polanin is a citizen of Northvale, New Jersey. In or about mid-June 2023, Ms. Polanin was surreptitiously entered into a loan agreement with Dividend when she was told that information being entered into a sales representative's tablet was for pre-approval of credit only. He promised that should I decide to finance the solar panel system, the monthly

payments would be $50 per month and that she would receive incentives from the government of approximately $8,000 which would allow the payment of the loan to remain the same throughout the life of the loan.     The representative took financial data from her and entered it into a tablet and told her she was pre-approved and directed her to just sign a screen, advising her that it was NOT a contract, just an estimate.  When Ms. Polanin expressed discomfort in signing anything, the representative reassured her that she was not entering a contract and entering her name onto the screen would only guarantee the price he was quoting her.  She reluctantly entered her name on various screens, but the language that was presented to her on the various screens was blurred out. The sales representatives were at her house from approximately 10 a.m. to 5 p.m.  The representatives never said anything about loan documents; she never received anything else in the mail; and they never discussed when payments would start.  At some time later when she was reviewing her emails, she saw an email from Dividend Finance.  The email indicated that she should review the attached documents and sign, but the document attached had already been signed. The document (purported contract) differed from what she had been told in that the monthly payment was $146.29, more than her monthly electricity bill.  The total amount of the alleged loan was $26,955. The incentive payment she understood she would receive from tax incentives was $8,086.50.  She called immediately and sought to cancel and was advised there was nothing she could do about it, that it was too late. Thereafter, an installer appeared at her house absent notice.  She again expressed dissatisfaction with the proposal and installation and further questioned about the need for permits to install the panels.  The installer told her not to worry. Thereafter, she received a violation notice from her town, seeking to charge her $2,000 for the installation that lacked permits.  This began an endless process of Ms. Polanin making continuous phone calls in an effort to extricate herself from the purported contract and the system that had

been installed without permits.  To date, Dividend had not proposed an acceptable solution and she has received an estimate from an independent contractor of $5,000 to remove the panels.

29.      Alternatively, Ms. Polanin entered into a loan agreement that was essentially worthless because of misrepresentations as to installation of the system and its operability which left Ms. Polanin with non-functioning solar equipment affixed to her roof.

30.      Plaintiff Hector Chaverra is a citizen of Toms River, New Jersey.  In or about late May 2022, Mr. Chaverra was surreptitiously entered into a loan agreement without his permission after Dividend's sales partner, represented he was only seeking pre-approval for credit only.

31.      The salesperson from Vison Solar, which was Dividend's solar power partner, promised that ultimately if he had a solar installed, he would only have to pay approximately $35 monthly, as he would receive both state and federal incentives. Moreover, he was promised that even before the system was made operational, the panels would store electricity so that when the panels came online, the stored electricity would be useable.  The representatives even promised there would be excess electricity that he could sell back to the utility company.   When the installer came, Mr. Chaverra asked about permits and was told, don't worry about that.  Once the panels were installed, they remained inoperable for approximately six months, despite calls he made multiple times per week over six months to follow up on trying to make the panels operational.

32.      Mr. Chaverra's panels did not perform as promised and he is paying the electrical company between $100.00-$200.00 per month.  For the last year he has also been stuck paying Dividend monthly on a loan of approximately $32,000.

33.      Alternatively, Mr. Chaverra entered into a loan agreement that was of limited value, where the Dividend's sales partner misrepresented the functionality of the solar system; the amount

of electricity it could generate and the availability of tax credits, and where Dividend secretly hid up front finance fees.

34.     Upon information and belief, Dividend Solar Finance LLC ("Dividend") was a Delaware limited liability company with its principal place of business at One California Street, Suite 1500, San Francisco, CA 94111. It also maintained offices at 3661 Valley Centre Drive, San Diego, CA 92130; 4001 Parmer Lane, Austin, TX 78727; 410 N. Michigan Ave., Chicago, IL 60611; 1980 Festival Plaza Drive, Las Vegas, NV 89135; and 10100 W. Charleston Blvd., Las Vegas, NV 89145. Dividend was wholly owned by DS Global Holdings LLC, a Delaware limited liability company. DS Global Holdings was wholly owned by Dividend Solar Inc. Dividend Solar Inc. is a Delaware corporation with its principal place of business in California and was wholly owned by Dividend Finance Inc. Dividend Finance Inc, was a Delaware corporation with its principal place of business in California and was wholly owned by Fifth Third Bank, N.A. Fifth Third Bank, N.A is a national bank with its principal place of business in Ohio and is wholly owned by Fifth Third Bancorp, a publicly traded corporation.

35.     On or about July 31, 2023, Dividend Finance LLC was merged into Fifth Third Bank, National Association, a national banking association formed under the laws of the United States.

36.     The effective merger date is August 1, 2023, and the surviving business entity, Fifth Third Bank, N.A., has its principal place of business at 38 Fountain Square Plaza, MD 10907F, Cincinnati, OH 45263.

### III. JURISDICTION AND VENUE

37.     This Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332 (d)(2), as the matter in controversy exceeds Five Million Dollars ($5,000,000.00) exclusive of costs and interest, and is a class action where at least one

member of the class of Plaintiffs is a citizen of a State different from any Defendant, a corporation incorporated in the State of Delaware and there are more than 100 class members nationwide.

38.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because this action, in part, arises under the Constitution or laws of the United States.

39.     This Court has personal jurisdiction over Defendant named herein because Defendant  transacts sufficient business in New Jersey,  has sufficient minimum contacts with New Jersey or otherwise intentionally avails themselves of the markets within New Jersey through offering loan products  through the predecessor unmerged company, Dividend, it sent monthly statements and sold products and services in New Jersey to New Jersey residents rendering the exercise of jurisdiction by the New Jersey courts permissible under traditional notions of fair play and substantial justice.

40.     Venue is proper in this Court pursuant to 28 U.S. C. § 1391(b) in that: this is the District in which a substantial part of the events or omissions giving rise to the claim hereinafter set forth occurred, and (ii) Plaintiffs Ms. Yarnall, Hibbards, Ms. Polanin, and Chevarra are all residents of New Jersey.

## IV.     FACTUAL BACKGROUND

41.     Plaintiffs incorporate the foregoing paragraphs as if fully restated here.

### The Growth of the Solar Lending Market and the Rise of Sharp and Deceptive Business Practices.

42.      The United States, as well as other countries, have experienced a rapid increase in the sale of residential solar panel systems (called solar photovoltaic or solar PV systems) that are affixed to the roof of a purchaser's home to generate electricity and offset household utility costs.

12

43.     This increased demand is driven in part by public policies that have offered tax credits for investment in solar energy.  One such solar tax credit was passed by Congress to reduce federal tax liability for homeowners who purchase residential solar panel systems, with a dollar-for-dollar reduction based upon the price paid for a qualifying system and installation.  Congress first enacted a version of the solar tax credit in 2005 of 30% for purchases up to $2,000.  Congress removed the $2,000 cap in 2009.  While it reduced the percentage to 26% in 2020, it extended the solar tax credit in 2022 as part of the Inflation Reduction Act, which raised the the percentage back to 30% to 2032.

44.     The solar tax credit is designed to incentivize the purchase of residential solar-panel systems and can be applied towards the amount paid during a given tax year for panels, labor costs for preparation and installation, related equipment, and certain energy-storage devices.  Costs of financing cannot be counted toward the solar tax credit.[1]

45.     As the sale of residential solar-panel systems have risen, so too, has sharp and deceptive sales tactics including: a) creating confusion about sellers' affiliation with utilities; b) overpromised savings; c) false promises about the suitability of the home for the cost-effective utilization of solar panels; d) failing to describe the length of time and steps necessary to install, inspect and activate the system, including the necessity of securing local permits necessary before installation; e) false promises about the availability of tax credits and other incentives; f) misrepresenting to potential customers that  their signatures secured by sales representatives via

---

[1] U.S. Dep't of Energy, *Homeowner's Guide to the Federal Tax Credit for Solar Photovoltaics* (March 2022) ("Miscellaneous expenses, including interest owned on financing [and] origination fees are not eligible expense when calculating your tax credit."), IRS, *Residential Clean Energy Credit* ("Do not include interest paid including loan origination fees.")

tablet devices during home visits were for credit approval as opposed to loan activations and g) remaining in customers' homes for hours to secure signatures.

46.     The sharp growth in sales of solar panel systems, has coincided with the rise of solar lending companies, such as Dividend, who utilized solar power companies, such as Vision Solar, to sell their financing.

47.     Rather than advertise directly to consumers, Dividend approached and entered relationships with solar companies whereby sales representatives for the solar companies feature Dividend's loans as part of "sales proposals" or "custom proposals" presented to potential customers as the way to pay for their purchase. These sales proposals, presented individually to each consumer live (in person or remotely) and designed for each specific home, are integral to the sales process and heavily relied on by consumers to understand the nature of the system and purchase of the solar-panel system. Consumers frequently agree to purchase their system based on the presentation of the sales proposal.

48.     Here, Dividend partnered with a solar company, Vision Solar, to integrate their loans into sales proposals. To maintain low installment payments throughout the life of the loan, which can be 10 to 30 years, customers are expected to receive the solar tax credit and use the credit to pay a lump sum to Dividend within an initial period—usually 18 months—after installation (referred to herein as "the tax-credit payment"). If the customer does not make the tax-credit payment, the loan re-amortizes, and the monthly payment sharply increases.

49.     The most attractive aspect of Dividend's loans to consumers is the low annualized percentage rates (APRs) featured and emphasized in sales proposals. Solar power partners, such as Vision Solar are experienced in sales of residential solar-panel systems and Dividend designed its

loans for solar companies to tout low APRs and low monthly payments that ostensibly will be equal to or exceeded by savings on utility bills resulting from a purchased solar-panel system.

50.     But the low APRs touted in sales proposals hide the true cost of financing to the consumer. Indeed, Dividend's primary revenue source is a large upfront financing fee that is included as a percentage of the total price of each consumer's loan. These upfront fees are referred to in various ways internally, including "program fees," "lending fees," "finance fees," "platform fees," "original issue discounts," and "dealer fees," among other labels, but they function the same basic way for each consumer and each loan.

51.     Dividend's upfront fees are unilaterally set by the Dividend at the outset of their relationships with its solar power partners, though Dividend communicates changes in the percentage amount of its fees from time to time based on borrowing costs and other business considerations. The fees vary depending on the loan but are usually between 10 percent and 30 percent of the stated total price of the system.

52.     Consumers are unaware of Dividend's upfront fees because Dividend does not allow sales companies to identify such fees in sales proposals and does not calculate such fees in advertised APRs or otherwise disclose the fees as finance charges. Instead, Dividend required its sales partner to hide the fee in the stated price of the financed system. This means that the upfront fee inflates the original principal amount of the loan, even though Dividend tells consumers that the stated price is disbursed to the solar company to pay for hardware and installation of the solar-panel system and not financing. When Plaintiffs have requested to see a break-down of the finance fees, Dividend has consistently refused to provide same.

**Dividend's Model and Representations to Consumers.**

53.     Upon information and belief, Dividend dictates the terms and methods to its solar power partners to market and sell its loans. It provides training to solar companies on how to market its loan products, including a video training and training slides on its loan products and how to sign consumers up for its loans.

54.     Dividend also provides solar power partners with a tool for designing sales proposals around its loans that include features of the loans as a prominent and important component of their sales proposals. Dividend emphasizes a "low APR & low fee products" in presentations to its solar power partners.

55.     Dividend's loan options are available to any consumer who purchases from one of its solar power partners and meets baseline qualification standards, including a minimum credit score and home ownership. The individualized interest rate and fees applicable to a given borrower are not based on individualized credit risk; instead, the annual interest rate and fees for a given loan product are the same for every qualifying borrower.

56.     The sales proposals used by Dividend's solar partners feature the loan and emphasize a low annual percentage rate that does not include Dividend's upfront fee in the calculation. Sales proposals for financed systems also identify a total price that does not identify that it includes Dividend's upfront fee. Like other sales proposals, those that feature Dividend loans emphasize low monthly installment payments (promised to be matched by savings on utility bills derived from purchased solar-panel systems) over the total price.

57.     Once the consumer agrees to finance with Dividend based on the sales proposal, the solar company representative will work with the consumer to visit Dividend's portal and enter their

name, address, and contact information to apply for the loan. The representative enters the information, loan product, and loan amount—often on the salesperson's tablet.

58.     Dividend emphasizes in trainings and communications to solar companies that its financing process and application approval process are "fast" and executed on the salesperson's tablet during their sales visit. It tells solar companies to "Focus on Selling, Not Fixing Paperwork" and that they can "Sell, Close, & Go On To The Next One" by using and marketing their loans to finance consumers' purchases. Dividend also offers prizes to salespersons that reach thresholds for loan sales, such as gift cards and devices.

59.     When a customer is signed up for a loan with the salesperson, Dividend will email loan documents to the consumer. Dividend would use different email addresses to send their communications, designed to confused consumers and to limit the consumer's timely receipt of documents.  As part of the package of emailed documents, Dividend includes a document that identifies "Truth in Lending Disclosures" including the "annual percentage rate" described as "the cost of your credit as a yearly rate," the "finance charge" described as "the dollar amount the credit will cost you," and the "amount financed" described as "the amount of credit provided to you or on your behalf."

60.     The statement further provides an "itemization of amount financed" that breaks down the stated amount financed as entirely including the "principal amount of loan" that is the "amount paid to others on your behalf...to seller/contractor for collateral/installation." The finance charge and annual percentage rate identified in the document does not include Dividend's upfront fee in either calculation.

61.     Dividend also emails a "Your Loan Summary" document to the consumer that identifies the same low rate as provided as the APR in the Truth in Lending Disclosures document.

62.     Dividend's loan documents further identify late charges and returned payment fees. No other fees, including the upfront fee, are identified.

63.     The largest cost to the consumer charged by Dividend as part of the loan is the large upfront fee imposed at the time of origination and added to the balance of the loan unbeknownst to the consumer. As noted above, the upfront fee is not included in the calculated "finance charge" or APR disclosed as the cost of financing to the consumer, nor is it otherwise disclosed or identified in any way at any time in the marketing, sales, and loan execution.

64.     Dividend's upfront fee is charged by Dividend on loans as a percentage of the loan balance, up to 31 percent and added to the balance when the loan is originated. While it is part of the loan balance taken out and owed by the consumer, the upfront fee is not disbursed to the solar company for parts and installation. It is instead retained by Dividend. The upfront fee is part of the loan balance that the consumer must repay over time, though a large portion (if not all) of the fee amount is paid by the consumer early in the loan's term if the consumer makes the tax-credit payment.

**The Process of Entering Plaintiffs into Dividend Loans**

65.     In all instances, Plaintiffs were entered into Defendant's solar loan program through interactions with door-to-door sales representatives.

66.     These representatives all would "evaluate" the consumer's home and take pictures to determine if solar would be available given the size of the property, possible obstructions such a tree.

67.     The sales representative would request electrical bills and begin a lengthy process of taking down personal credit information from the potential customer which they would enter into a tablet.  During this process, the representative would make multiple phone calls seeking

18

information from alleged "higher ups," sometimes directly calling Dividend representatives. In many instances, the representative would step outside of the customer's presence to make the call, to prevent the customer from hearing the exchange.

68.     During the presentation, the representative would indicate how much electricity and the value of electricity that the consumer could expect from the installation of the system.  The representative would also represent the value of the tax credit that a consumer could expect.  The sales pitch also included a representation as to a monthly amount that each Plaintiff would pay under the financed loan, further representing that the amount would remain the same for the life of the loan, as long as, the borrower returned the amounts of tax savings/credits (Incentive Payment) before the 16th monthly payment on the loan. In all instances, the plaintiffs were told that the costs of the solar system would be equal or less than the monthly payments to Dividend.

69.     While Plaintiffs asked for time to consider the options, seller's representative would tell consumers they would not be agreeing to enter into a binding agreement but would merely be seeking pre-approval for credit, should they choose to move forward sometime in the future.

70.     In all instances the representatives would present screen pages on the representative's electronic tablet and demand the customer's initial or signature on various screens presented to the customer or the representative would initial or sign the screens on behalf of the customer.

71.     In all instances the sales representatives would stay for hours, sometimes as long as 4-5 hours until they were able to get a Plaintiff to enter initials on pages presented to each Plaintiff on the representative's tablet. At times, the representatives refused to leave despite the homeowner requesting same and in one instance, the homeowner had to resort to calling the police.

72.     At no time during the presentation did the representative explain that the particular finance agreement contained hidden fees that were not included in the APR quoted.

73.     At no time during the presentation, were the Plaintiffs informed that installation could be immediate, and some Plaintiffs had workers at their house within days. Other plaintiffs arrived home from work to find solar panels on their rooftops without receiving any advance notice.

74.     At no time during the presentation, were the Plaintiffs informed that a majority would never qualify for tax incentives that were promised to prevent the high escalation of their monthly loan.

75.     Nor were Plaintiffs advised through the representative or Dividend that the process for installation could take months or might never be completed based upon permit requirements and necessary inspections and certifications required by the utility companies.

76.     Nor were Plaintiffs advised by representatives that the bulk of  the total payment would be released upfront to the solar power partner by Dividend to pay themselves and the contractors before the systems were operational and that Plaintiffs would be responsible for payment on loans before the systems were operational, thus providing little or no incentive for the solar power partner to complete the process so the system would become operational.

77.     Thus, these misrepresentations and omissions meant that Plaintiffs were unable to make timely incentive payments to maintain the quoted "low" monthly loan payment.

78.     As a result of these misrepresentations and omissions, many Plaintiffs have installations on their roofs without any functioning solar power.

79.     Other Plaintiffs have systems that are merely providing a fraction of the power generation that was promised.

80.    Still others have sought to have the installations removed and their contracts rescinded but these requests were ignored by Dividend. Other panels were removed due to failed plans and inspections and never re-installed, but Dividend continues to demand payment.

**Dividend's Knowledge and Participation in Fraud**

81.    Before selling its solar finance loans, Dividend knew, or was reckless in not knowing, the misrepresentations and omissions and deceptive practices that were utilized to enter Plaintiffs into loan agreements.

82.    Dividend did not implement a plan to address the results of their fraudulent and deceptive practices.

83.    Dividend consumers have notified and complained to Dividend that their Loans were the product of deception and fraud.

84.    Dividend was aware of these issues as reflected in public postings of consumers complaining about their deceptive practices in entering consumers into loans:

From the Consumer Financial Protection Bureau[2]

a)  February 7, 2024

> Fifth-Third bank owns Dividend Finance. Dividend Finance is using fraudulent forged documents to pursue money from me and my wife. They illegally drafted money from my checking account. I never authorized anything with them. In XXXX of XXXX my XXXX veteran wife and I applied for a solar loan with a representative in our home, on our WiFi. We never used his laptop. Neither my wife, XXXX XXXX, or myself ever saw any loan information or agreed to any loan terms. It was strictly to apply. We had no reason to believe this person was lying to us and trying to defraud

---

[2] See, Consumer Fraud Protection Bureau Complaint Database at https://www.consumerfinance.gov/data-research/consumer-complaints/search/?date_received_max=2024-06-16&date_received_min=2011-12-01&has_narrative=true&page=1&searchField=all&searchText=6444963&size=25&sort=created (Last accessed 6/17/24). The "XXXX" appearing in the text of complaints are redactions done by CFPB.

us. My wife did not sign the loan XXXX, I did not sign the loan XXXX. The only person filling out the loan information was the sales representative. My wife made Dividend aware as soon as she found out fraud had occurred. It was never investigated; Dividend used the forged documents to state the loan was valid and an excuse of " answered questions ". I was there, he did ask us questions and we both answered we thought it was part of the loan verification since both of our credits were supposed to be frozen. It turns out that my wife 's XXXX file only was not frozen due to XXXX error which she is dealing with. That is why it does not appear on all three credit bureaus or on my credit report because the sales representative took both of our information, and we honestly did not even know until later about it not having both of our names. We were defrauded. Dividend Finance was informed and has not completed a fraud investigation.

Complaint ID: 7353254, State: FL.

b) January 16, 2023

I was sold a solar system from XXXX XXXX XXXX XXXX XXXX XXXX of 2021. The company told me I would receive a Government incentive of XXXX this was misrepresented. The company salesperson filled out my loan paperwork on a tablet, I was never given paper copies of anything. Or told of my timeline to cancel. The company filed bankruptcy without completing my Solar Installation, and Dividend finance company is still holding me responsible for the loan without me receiving anything in my contract. The loan is set to balloon if I don't give them {$14000.00} the full amount of my estimated Government Solar rebate. This rebate is not a lump sum or automatic, you have to qualify. Had I been informed about this I would not have agreed to get Solar. Had I known that the products being used were faulty, I would not have gotten the loan. I don't understand how I can be responsible for equipment that wasn't installed and services not being provided, and they expect the full price of this system which is nearly {$60000.00}.

Complaint ID: 6444963, State: IL

c) April 24, 2024

Dividend Financial, a partner of Fifth Third Bank are predatory lending practices. I've had a loan with them for solar panels by XXXX XXXX, whom promised me everything was good, no leans on my house since I paid cash, which I will be filing another report against XXXX XXXX, my loan is going up not down and I have been paying for over a year $ XXXX FOR

OVER A YEAR. I CALLED DIVIDEND FINANCIAL, and asked why the balance has not gone down it's gone up, I was told that they charge 1.29 % EVERY DAY. APR IS 2.99 % which means I will never be able to pay it off. I was forced into both contracts the day XXXX XXXX showed up at my door and used aggressive sales tactics, I DIDN'T GET THE MANDATORY 3 DAY WAIT PERIOD, EVERYTHING HAD TO BE SIGNED RIGHT THEN AND THERE'S (sic). I have been dealing with this for over a year, but the not even getting the chance to even read either contract, and the 1.29 % every day interest is abominable. XXXX XXXX used to be XXXX, and they went under. This has got TO BE EXPOSED AND RECTIFIED. I'VE RELENTLESSLY TRYING TO GET HELP WITH THE WHOLE SITUATION EVERY DAY. Isn't that double dipping? They are both in cahoots with each other, and my roof was not sound enough to even put the panels there to begin with. I'm currently in the middle of filing for XXXX, no income in close to 2 years, XXXX XXXXXXXX and XXXX XXXX XXXX XXXX XXXX XXXX. I was totally taken advantage of and lied to from the start. Because of dividend financial and XXXX XXXX my credit report went from XXXX 's to low XXXX 's. First time homeowner. Again took advantage. I was told the tax kickback would be half of the loan. Come to find out it's a CREDIT not REFUND. They have put me {$70000.00} roughly in debt, PLUS I've never even financed anything. How many other people have they ruined financially for the rest of our lives? I can't even sell my house if I wanted to because dividend financial has put a UCC lean (sic) on my house, but I have not signed it nor will I pay for something I had no knowledge of and was lied to about. XXXX XXXX also took a 2nd loan out and lied to me and told me it was not approved, and to throw anything from XXXX XXXX XXXX to not even open it. Low in (sic) behold I started investigating more and more about both. I've been ghosted by XXXX XXXX, and dividend financial has XXXX.

Complaint ID 8694262, State: TX

d) April 29, 2023

In XXXX of XXXX a sales representative from XXXX XXXX came to my home and gave a sales presentation to myself and my wife. My wife is a XXXX veteran and I am her XXXX. The sales representative is named XXXX XXXX. He was friendly and nice. He made it seem very easy and that the payments for the solar panels would be the exact same price at one

low interest rate and would not change, unlike increasing electric rates. This seemed to offset the fact that XXXX XXXX charged twice as much as most solar companies, this low interest rate. XXXX took our information and very specifically said that no payments would be made until the entire installation was completed and that we would receive communication from the loan company to sign. We signed nothing. My wife signed nothing. We were also told we would have to have trees removed for the solar panel install but that some of this money would be rebated to us. Then in XXXX the panels were going to be placed on our roof but we needed the trees removed and trimmed back, we had to put that money forward ourselves. After the panels were placed on our roof the installation was not completed because an interconnectivity needs to be completed by the contractor. This is something XXXX XXXX even has listed on their website. They never completed the proper paperwork to have this completed. Our initial salesperson became unreachable. We could reach no one at their company. We received a form from Dividend Finance stating that the installation was complete to which my wife responded that this was not the case. Because installation never was completed and also, we never signed any loan forms also none of the loan terms were completely explained to us, at all. The fact that the interest rates increase and the fact that this finance company disguises balloon payments as " incentive payments " was not agreeable to us at all. We did not even know who's name the loan was in until Dividend Finance emailed us a XXXX loan modification form, which was to my wife and she refused to sign it. Despite receiving all of these reasoning (sic) in writing to Dividend Finance, they proceeded to draft money from our joint checking account. We contacted them and there was no way to remove our checking account information. My wife disputed the information with the credit bureau and they have put it back on. Presently, we are in the end of XXXX beginning of XXXX, XXXX XXXX abandoned the solar project at our house. We informed them in writing to return the funds to Dividend Finance per FL statute title XXXII XXXX & XXXX in XX/XX/XXXX after it had been abandoned over 90 days. A copy can be seen on the XXXX it is complaint number XXXX. Despite all of this, Dividend Finance continues to steal money from my (sic) and my wife 's joint checking account. Please investigate them, I'm sure we are not the only people they are mishandling. I would like our funds returned and to be compensated. Thank you.

Complaint ID: 6907802, State: GA

24

From Trust Pilot Review

e) January 26, 2024

> [W]e hired Vision Solar in November 2022 the salesperson told us this was part of a Florida initiative to get Floridians to go green and there would be tax credits and incentives, the sales guy called Dividend while in our home to check my Husbands (sic) credit and to see if we PRE-Qualified for panels. [H]is credit was declined by Dividend Finance, even though he is the main income for our household and had good credit and a good permanent job.
>
> [T]hey then suggested checking my credit and then said I cleared.  I was at the time and still am a stay-at-home mother who no income of my own, however, the said it would be best for me to be solely listed.  We were not aware we signa LOAN CONTRACT, and once I found out I contacted Dividend to let them know we had been misled. They didn't care.
>
> [A]fter receiving an email from Divided finance in January saying our installation was cocomplete, I called them to let them know my concerns and that our project was NOT complete, and the panels were NOT operational.  They explained way my concerns and told me I did not have to pay anything yet as they were accepting loan payments from VS on my behalf while my panels are not operational.
>
> I never gave consent for them to do this.
>
> We were deceived into this loan contract.
>
> They have never shown me a Loan Agreement, only a Guidebook. Despite me asking them numerous times for a copy of my complete file, loan Agreement, my request to Dividend and Fifth Third Bank continue to go unanswered The Panels have never been operational and I have never had access to Portals to my account with Vison Solar or Dividend.  I also have and Email from April 3rd 2023 showing that I requested that information and help to log into my account and they never responded.
>
> Dividend has also placed a Lien on my Property for the cost of the panels without notifying me.  Under Florida law "when filing a UCC financing statement that has been records, a copy must be sent via registered mail (return receipt requested) to properly notify the owner." Apparently these steps were not followed, Dividend MUST, at a minimum, release eh loans and release the liens.
>
> Then there are solar panels to be removed, roof to be repaired replaced and mod to be remediated along with other damages.

Shame on Dividend for taking advantage of an "easy loan" and for not doing their due diligence before making advance payments to their installer (Vision Solar). VS has been criminal since DAY ONE. The writing was all over the walls.

The loan contracts are FRAUD from is FORMATION. Their "arbitration clause" means NOTHING.

[I]t is now up to Dividend on how they would like to move forward and fix this problem with the victims.

It is THEIR choice to choose to be part of the problem or fix immediately Legal Action is taking place and they will be sorry.

Ramos, FL

From Better Business Bureau

f) April 19, 2023

Worst company ever. Getting contract signed in a fraudulent way.   Never getting back to you when said.  Lied about 0electric(sic) and 30 percent rebate. Too many panels put in wrong place.  Too expensive for 74 year old. All lies told by well trained salesmen.  I believe Dividend Financial is in it with Vision Solar. Jonathan Seibert gets rick off scamming the elderly and handclapped because we own our homes.  They don't mind taking our homes.  You should all be a shame (sic) what you are doing to the elderly. You have stressed us out.  Why don't you come and visit and see for yourself what is going on.  I want panels taken off and loan terminated. One member of your team said that could be done.  We will see.  Thank you.

Carliss w. Cline, New Caney, TX.

g.) November 3, 2022

I thought I would be using Solar power by now.  The panels have been on my roof since September 2022. Two leaks showed up in my ceiling. The permit has not been completed. The vision Solar company is not responding. I don't know what is happening, and I am receiving bills for Dividend Solar. If you want to be involved with a company like that, then Vision Solar is the company for you!

Bynam, Kissimmee, FL.

## VI.   NEW JERSEY'S SUBSTANTIVE LAW APPLIES TO THE PROPOSED NATIONWIDE CLASS

85.   Plaintiffs incorporate the foregoing paragraphs as if fully restated herein.

86.   New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class Members, as well as to the Defendant's predecessor entity, Dividend who marketed its solar loans doing significant business is in New Jersey, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

87.   The application of New Jersey's laws to each of the claims alleged by the Class is also appropriate under New Jersey's choice of law rules.  In particular, New Jersey law applies to the CFA claim under the most substantial relationship test, and New Jersey law applies to the remaining claims under the most substantial relationship test as well.

88.   New Jersey has significant contacts and/or a significant aggregation of contacts to the claims asserted by Plaintiffs and all Class Members.

89.   Specifically, New Jersey's interest in this case and in regulating conduct under its laws arise from, among other things, the fact that Defendant's predecessor, Dividend and Defendant have a presence in and conducts substantial business in New Jersey and several named Plaintiffs and other members of the Proposed Class reside and/or purchased their solar panel systems in New Jersey.

90.   In the alternative, the court may apply the substantive law of the states where the named plaintiffs reside and/or bought their solar panels:  New Jersey and Connecticut.

## V.   CLASS ACTION ALLEGATIONS

91.    Plaintiffs bring this action on their own behalf and on behalf of the Putative Class of all other persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

92.    Plaintiffs bring this action as class representatives to recover damages and/or refunding from Defendant predecessor's fraud, and violations of New Jersey Consumer Fraud Act, for violations of other state's statutory and common law, for injunctive relief, declaratory judgment, and restitution.

93.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23 (a) and (b).

94.    Plaintiffs seek certification of a Class of all persons in the United States who were fraudulently entered into Loan Documents, during the longest period permitted by the applicable statutes of limitations, to finance the sale and installation of solar equipment on their residential home during the relevant time period.

95.    Plaintiffs seek certification on behalf of the following "Involuntary Entered Subclass": All persons in the United States included in the Putative Class who did not voluntarily sign up for loan with Defendant's predecessor, Dividend.

96.    Plaintiffs seek certification on behalf of the following "Voluntary Entered Subclass": All persons in the United States included in the Putative Class who were unable to derive the full benefit of their loan due to illegal installations due to failed inspections and the absence of permits;  misrepresentations about the product, the timing of installation, the amount of power generated, the value of tax incentives made at the point of sale and because of hidden service fees undisclosed by Defendant's predecessor, Dividend.

New Jersey Sub-Class- All persons resident in New Jersey who were entered into a loan agreement with Dividend for the purchase of solar power on their residential home.

Connecticut Sub-Class-All persons residing in Connecticut who were entered into a loan agreement with Dividend for the purchase of solar power on their residential home.

97. Plaintiffs reserve the right to modify or amend the definition of the Putative Class(es) before the Court determines whether certification is appropriate.

98. Excluded from the Class are:

a) Defendant, Defendant's predecessor, Dividend, and any entities in which Defendant has a controlling interest;

b) Any entity in which Defendant's and Dividend's officers, directors, or employees are employed and any of the legal representative, heir, successor, or assigns of Defendant or Dividend;

c) The Judge to whom this case is assigned, and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d) Persons or entities with claims for person injury, wrongful death, and/or emotional distress;

e) All persons or entities that properly execute and timely file a request for exclusion from the Class;

f) Any attorneys representing the Plaintiffs or the Class; and

g) All governmental entities.

99. **Numerosity**: Members of the Class are so numerous that their individual joinder is impractical. The precise identities, number and address of members of the Class are unknow to the Plaintiffs but may and should be know with proper and full discovery of Defendant, third parties, (if any), and their respective records.

100.   **Commonality and Predominance**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, include, but are not limited to, the following:

a)  Whether and to what extent Dividend's and Defendant's business practices and conduct violate New Jersey law;

b)  Whether and to what extent Dividend's and Defendant's business practices and conduct violate Connecticut law;

c)  Whether and to what extent Dividend's and Defendant's business practices, acts, and omissions violated the New Jersey Consumer Fraud Act, N.J.S.A. §56:8-2, *et seq.*;

d)  Whether and to what extent Dividend's and Defendant's business practices, acts and omissions. violated the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110a-42-110 q;

e)  Whether and to what extend Dividend's and Defendant's business practices violated New Jersey Homeownership Spending Act N.J.S.A. §46:10B-22-35;

f)  Whether Defendant and Dividend intended their consumers to be misled;

g)  Whether Defendant and Dividend intended that consumers rely on the misrepresentations made by sales representatives of their sales partner, Vison Solar;

h)  Whether Dividend's and Defendant's involuntarily entering customers into loan agreements is fraudulent, deceptive, or misleading;

i)  Whether Defendant and Dividend had knowledge of the deceptive, misleading actions of its sales partner, Vision Solar;

j)  Whether Defendant and Dividend had knowledge of the false and misleading statements of facts and concealment of material facts regarding the process selling Dividend's loan; the process and timing for the installation and operation of the solar system, the output of the solar panels, state and federal tax credits to be secured as a result of the purchase of the solar power system that was sold to allow the customer to significantly reduce the monthly loan payments;

k)   Whether consumers suffered an ascertainable loss;

l)  The nature and extent of damages and other remedies the class members are entitled to;

m) Whether Dividend and Defendant knowingly concealed the upfront finance fee to consumers who entered into Loan Agreements;

n)  Whether as a result of the misconduct set forth herein, Defendant and Dividend violated the common laws of negligent misrepresentation;

o)  Whether Defendant's and Dividend's marketing of home solar systems with its financing was fraudulent;

p)  Whether Defendant's and Dividend's administration of its solar loan package to consumers had been in bad faith;

q)  Whether Plaintiffs and the Putative Class are entitled to restitution of all amounts acquired by Defendant through its common and uniform scheme;

r)  Whether Plaintiffs and the Putative Class are entitled to prospective injunctive relief enjoining Defendant from continuing to engage in its fraudulent, deceitful, unlawful and unfair common scheme as alleged in this Complaint;

s)  Whether Plaintiff and the Putative Class are entitled to recover compensatory and punitive damages as a result of Defendant's and Dividend's wrongful scheme.

101.    **Typicality**:  Plaintiffs' claims are typical of the claims of members of the proposed Class because they purchased the same basic solar panel systems and were exposed to the same uniform non- disclosures.

102.    The factual bases of Defendant's predecessor, Dividend's misconduct is common to the members of the Class and represent a common thread of fraudulent misconduct, deceptive trade practices, and breach of warranty resulting in injury to all proposed Class Members. Plaintiffs are asserting the same rights, making the same claims, and seeking the same relief for themselves and all other members of the proposed Class.

103.    **Adequacy**: Plaintiffs are adequate representatives of the proposed Class because

31

they are members of the proposed Class and do not have interests that conflict with those of the proposed Class members they seek to represent.

104.    Plaintiffs are represented by experienced and able counsel who has litigated numerous class action lawsuits, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the proposed Class.  Plaintiff and his counsel can fairly and adequately protect the interests of the members of the proposed Class.

105.    **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is not economically feasible and is procedurally impracticable.  While the aggregate damages sustained by the Class are in the millions of dollars and are no less than five million dollars upon information and belief, the individual damages incurred by each Class member resulting from Defendant's predecessor, Dividend's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  In addition, Defendant, through its predecessor in interest, Dividend, has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is

appropriate.

## IX.    CLAIMS FOR RELIEF

### FIRST COUNT
### (Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, *et seq.* and Substantially Similar Law of Certain Other States)

106.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

107.    Plaintiffs and other members of the Class are "consumers" within the meaning of the CFA and the consumer protection statues of certain other states.

108.    The residential solar systems and the loan are "goods" within the meaning of the CFA.

109.    At all relevant times material hereto, Dividend conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

110.    The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under other remedies.

111.    Dividend deceptive conduct and misrepresentations, including with respect to its role in obligating Plaintiffs to long-term loans, violated N.J.S.A. 56:8-2.22 and in and of itself constitutes an unconscionable commercial practice:

> It shall be an unlawful practice for a person in connection with a sale of merchandise to require or request the consumer to sign any document as evidence or acknowledgement of the sales transaction, of the existence of the sales contract or of the discharge by the person of any obligation to the consumer specified in or arising out of the transaction or contract, unless he shall at the same time provide the consumer with a full and accurate copy of the document so presented for signature but this section shall not be applicable to orders place through the mail by the consumer for merchandise.

112.    Dividend's failure to provide the loan agreement violates the CFA, N.J.S.A. 56:8-

2.2.

113.   Dividend has engaged in deceptive, unconscionable, unfair, fraudulent and misleading commercial practices in the marketing and sale of residential home solar systems, including its financing which it knew to be unlawful.

114.   Dividend had exclusive knowledge of its deceptive, unconscionable, unfair, and misleading practices at the time of sale. The deceptive terms and practices are not something that Plaintiffs or Class members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

115.   Dividend, through its sales representatives and agents falsely advised consumers that its representatives were going through a loan pre-credit approval process while, instead, it was surreptitiously entering them into costly loan agreements with Dividend.

116.   When consumers sought to exercise a right to cancel such loans, Dividend through its sales agents engaged in purposeful acts to delay consumers ability to cancel the loans.

117.   Dividend represented that the solar panel system and its financial benefits would pay for the monthly loan payments when it had knowledge that this was not true.

118.   Dividend concealed from consumers hidden upfront financing cost.

119.   In its marketing and sale of the residential solar system and its financing, Dividend undertook active and ongoing steps to conceal the true financing cost to the consumer and the true facts regarding the ability of the solar power system to pay for the monthly costs of financing. and has consciously withheld material facts from Plaintiffs and other members of the Class with respect to the true nature of the savings to be achieved through solar power and the true financing cost of the loan.

120.   Plaintiffs are aware of nothing in Dividend's advertising, publicity, or marketing

materials that discloses the truth about alleged savings to be achieved through the solar power installation and the financing of that installation through Dividend, despite Dividend's awareness, or reckless unawareness, of the problem.

121.    Dividend's conduct was objectively deceptive and had the capacity to deceive reasonable consumers under the circumstances.  The fact that solar panels could not achieve the generation of power represented to customers; could not be installed and certified early enough for the consumer to take advantage of an early installment payment to significantly reduce the monthly amount of the loan payment; could not qualify for the level of tax incentives as promised at the time of sale,  and that the loan included a hidden upfront finance fee were all material facts that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase. These facts would influence a reasonable consumers' choice of action during the purchase of their solar system along with its financing.

122.    Dividend intended that Plaintiffs and the other members of the Class to rely on its acts of concealment and omissions to compel them into the purchase of residential solar power systems that were useless or nonconforming as promised rather than paying less for them or purchasing competitors' systems.

123.    Dividend intended that Plaintiffs and the other members of the Class to rely on its acts of concealment and omissions to force them into the purchase of a loan with fees significantly higher than that of competitors.

124.    Had Dividend disclosed all material information regarding the residential solar power system and its financing to Plaintiffs and other members of the Class, they would not have purchased the system or the financing or they would have paid less for them.

125.    Dividend's conduct had an impact on the public interest because the acts were part

of a generalized course of conduct affecting numerous consumers.

126.    Defendant, as successor to Dividend is responsible for all actions of its predecessor in interest.

127.    As a result of the foregoing acts, omissions, and practices, Plaintiffs and other members of the Class have suffered an ascertainable loss by purchasing useless solar systems or those of limited value and being forced into unconscionable loan agreements. Plaintiffs are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees, and costs of suit.

128.    Application of the CFA to all Class members, regardless of their state of residence, is appropriate as described herein and because, *inter alia*, the facts and circumstances of this case reflect numerous contacts with the State of New Jersey so as to create a state interest in applying the CFA to Defendant, as successor to Dividend, thereby making application of New Jersey law to the entire Class appropriate.

**SECOND COUNT**
**Violation of the Connecticut Unfair Trade Practices Act**
**(on behalf of Connecticut Sub-Class)**

129.    Plaintiffs Funk incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

130.    Plaintiffs Funk asserts this claim individually and on behalf of the Connecticut sub-class. Plaintiffs Funk are "person(s)" as defined in the Connecticut Unfair Trade Practices Act (CUTPA) Connecticut General Statutes §§ 42-110b.

131.    The Connecticut Unfair Trade Practices Act ("CUTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a).

132. Dividend is a "person" within the meaning of CUTPA, Conn. Gen. Stat. 42-110a(3). At all relevant times, Dividend was acting in the conduct of trade or commerce as it advertises, distributes, markets and sell its residential solar loans to consumers in Connecticut and the rest of the United States.

133. At all relevant times, Dividend was prohibited by CUTPA, Conn. Gen. Stat. 42-110a et seq., from engaging in unfair, deceptive and/or misleading acts and/or practices in the conduct of any trade or commerce.

134. Based on the conduct alleged herein Dividend engaged in unfair and deceptive acts or practices in violation of Conn. Gen. Stat. 42-110b. In its business, Dividend failed to disclose and actively concealed the hidden upfront fees to consumers, allowing them to believe they were securing favorable financial terms that were actually significantly less favorable then represented.

135. Dividend also engaged in unlawful trade practices by employing deceptive acts or practices, misrepresentations or omissions of material facts when it, working through their solar power partners, made such false representations to Plaintiffs about the savings they could expect from the installation of solar power and from tax savings.

136. Dividend's acts and practices offend public policy as established by statute.

137. Dividend's acts and practices were immoral, unfair, unscrupulous, oppressive and unethical, especially insofar as these acts and practices exploited the vulnerabilities of Plaintiffs Funk and the Connecticut Class.

138. Dividend's acts and practices caused substantial injury to Plaintiffs Funk and Connecticut Class members because: (a) they would not have purchased the solar power system or would not have purchased it on the same terms, if the true facts concerning the system and financing had been known; and (b) they paid a price premium due to Dividend's false marketing

and selling of the system as paying for itself.   Consumers have thus overpaid for the solar power system or have non-functioning systems, all of which could have been reasonably avoided. Such injury is not outweighed by any countervailing benefits to consumers or competition.

139.    Dividend's unfair and/or deceptive practices directly, foreseeably, and proximately caused Plaintiffs Funk and the Connecticut Class to suffer an ascertainable loss, including overpaying for the solar power system, being deprived of the use of the system for which they paid a premium, but which are not fit for their ordinary purpose, and losing resale value.

140.    This class action is specifically permitted by Conn. Gen. Stat.. § 42-110g(b).

141.    As a result of Dividend's violation of CUTPA, Plaintiffs Funk and the other Connecticut Class members should be awarded damages, including punitive damages, in an amount to be determined at trial.

142.    Defendant, as successor in interest to Dividend, is responsible for all actions of its predecessor in interest.

143.    Plaintiffs Funk and the Connecticut Class seek to recover all relief available under the statute, including but not limited to any equitable relief available and reasonable attorneys' fees and costs incurred in connection with this action.

## THIRD COUNT
### (Fraudulent Concealment/Nondisclosure)

144.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

145.    Dividend knew or was reckless in not knowing at the time of sale of each residential solar power system combined with its loan agreement that consumers were initially being intentionally misled into believing they were simply applying for pre-credit approval when in reality they were being involuntarily entered into a loan agreement.

146.    Dividend knew or was reckless in not knowing that its partner, Vision Solar, was making misrepresentations of material facts about the timing and process of the installation of the system; the power that could be generated by the systems;  and the availability of state and federal tax incentives to offset the costs of the monthly loan payments.

147.    Dividend intentionally failed to disclose to its customers a hidden upfront finance fee that significantly increased the financing cost to the consumer.

148.    Dividend had or should have had exclusive knowledge of the misrepresentations and omissions that were made as part of the sale of the products and the loan. The misrepresentations and omissions are latent and not something that Plaintiffs or Class Members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

149.    Dividend had the capacity to, and did, deceive consumers into believing that they were purchasing a solar system that would work to offset the costs of any financing that they received.

150.    Dividend undertook active and ongoing steps to conceal the misrepresentations and omissions because Dividend knew or should have known that it alone could alert consumers to the presence of the deceit and fraud in the sale of the system and its financing, yet Dividend chose not to do so.

151.    Plaintiffs were unaware of anything in Dividend's advertising, publicity, or marketing materials that discloses the truth about the system and its financing, despite Dividend's awareness of the problem.

152.    The facts concealed and/or not disclosed by Dividend to Plaintiffs and the Class are material facts in that a reasonable person would have considered them important in deciding whether to purchase the solar panel system and its bundled financing.

153.    If the facts concealed and/or not disclosed by Dividend to Plaintiffs and the proposed Class had been disclosed to Plaintiffs, the Plaintiffs would not have purchased their systems or would only have purchased them for a reduced price.

154.    Dividend had a duty to disclose the true facts about the level of power to be generated by the systems; the limited ability for tax benefits and the length of time to correctly install and get the systems certified for operation that would allow consumers to take advantage of an early pre-payment plan; and the existence of a hidden upfront finance fee.

155.    Dividend had a duty to disclose the fact that the promises made could not be fulfilled after sale, but before the start of installation of solar system, because consumers would reasonably expect disclosure of these misrepresentations and omissions.

156.    Dividend intentionally concealed and/or failed to disclose the problems with the solar panels for the purpose of inducing Plaintiffs and the Class to act thereon.

157.    Plaintiffs and the Class justifiably acted or relied upon the concealed and/or non-disclosed facts to their detriment, as evidenced by their purchase of the Solar Panels.

158.    As a direct and proximate cause of Dividend's misconduct, Plaintiffs and Class Members have suffered actual damages in that they bought solar systems that did not work at all or failed miserably to produce the cost savings that were promised. and they will be required to incur costs to make the systems operational or to remove the panels.

159.    Dividend's conduct has been and is wanton and/or reckless and/or shows a reckless indifference to the interests of others.

160.    Dividend has acted with malice by engaging in conduct that was and is intended by Dividend to cause injury to the Plaintiffs and the Class.

161.    Dividend has committed fraud through its concealment of material facts known to

it with the intent to cause injury to the Plaintiffs and the Class.

162.    Defendant as successor in interest to Dividend is responsible for all of Dividend's acts as outlined herein.

163.    Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Defendant for actual and punitive damages for themselves and each member of the Class, plus attorneys' fees for the establishment of a common fund, interest, and costs.

### FOURTH COUNT
### (Unjust Enrichment)

164.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

165.    To the detriment of Plaintiffs and the Class, Defendants have been, and continue to be, unjustly enriched as a result of their wrongful conduct alleged herein.

166.    Plaintiffs and the Class conferred a benefit on Dividend when Dividend involuntarily enrolled Plaintiff and Class Members in the residential solar system agreement and in the loan agreement without their knowledge and/or consent.

167.    Dividend unlawfully accepted said benefits, which under the circumstances would be unjust to allow Defendant to retain.

168.    Defendant, as successor in interest, accrued the benefits of Dividend's unlawful acts.

169.    Plaintiffs and the Class Members, therefore, seek disgorgement of all wrongfully obtained profits received by Defendant as a result of their inequitable conduct.

**FIFTH COUNT**
**(Negligent Misrepresentation)**

170.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

171.    Dividend, through its agents and partner, made a series of misrepresentations and material omissions, as alleged herein.  Dividend's statements were material, false, deceptive, and misleading and omitted material facts necessary to make the statements not misleading; such material misrepresentations and omissions were the result of the Dividend's negligence.

172.    Dividend owed a duty to Plaintiffs and members of the proposed Class to exercise reasonable care in making representations about the residential solar power system and its bundled financing.

173.    Plaintiffs and the proposed Class Members relied (or should be presumed to have relied) on Dividend's material representations and omissions in purchasing the solar panel system and its financing.  As a result of their justifiable reliance, Plaintiffs and members of the Class were induced to and did purchase the solar systems and its bundled financing.  Plaintiffs' reliance and the Class Members' reliance were reasonably foreseeable by Dividend (and in fact, that is why Dividend made the misrepresentations that it did).

174.    As a direct and proximate result of the negligent misrepresentations made by Dividend, Plaintiffs and the Proposed Class Members have been damaged.

175.    Defendant, as successor in interest to Dividend, is responsible for the unlawful acts of Dividend.

## X.      PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the Class Members, pray for judgment against Defendant granting the following relief:

1.      An order certifying this case as a class action and appointing Plaintiffs to represent

the Class and Plaintiffs' counsel as Class counsel;

2.      All recoverable compensatory and other damages sustained by Plaintiffs and the Class;

3.      Restitution and disgorgement of all amounts  obtained  by Dividend and Defendant, as successor in interest, as  a result of Dividend's misconduct, together with interest thereon from the date of payment, to the victims of such violations;

4.      Actual and/or statutory damages for injuries suffered by Plaintiffs and the Class in the maximum amount permitted by applicable law, including mandatory treble damages pursuant to the New Jersey Consumer Fraud Act;

5.      Actual and/or statutory damages for injuries suffered by the Connecticut sub-class in the maximum amount permitted by applicable law, including damages pursuant to the Connecticut Unfair Trade Practices Act.

6.      An order (i) requiring Defendant to immediately cease its wrongful conduct as set forth above; (ii) enjoining Defendant from continuing to conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; and (iii) requiring Defendant to release those Plaintiffs who seek recission from all purported loan agreements entered, and to refund to Plaintiffs all loan payments and to provide the funds necessary to remove the solar panel system and repair any damage as a result of removal, or alternatively, (iv)  to reform the loan agreement for those Plaintiffs who seek terms where the monthly loan does not surpass the value of the monthly output of the panels and the hidden fee is removed from the loan amount and;  to provide these Plaintiffs with the funds necessary to make each system legal and operable along with providing effective product warranties and sufficient funds to pay for necessary repairs;

7.      Statutory pre-judgment and post-judgment interest on the Class damages;

8.      Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

9.      Such other relief as the Court may deem just and proper.

### XI.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action so triable.

By: /s/ Bruce H. Nagel
BRUCE H. NAGEL
Diane E. Sammons
**NAGEL RICE, LLP**
103 Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
bnagel@nagelrice.com
dsammons@nagelrice.com

Dated:  June __, 2024